IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMBER ACKERMAN, | ) | CASE NO. 3:23-CV-00224-JGC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **JUDGE JAMES G. CARR** |
| vs. | ) | **UNITED STATES DISTRICT JUDGE** |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MAGISTRATE JUDGE** |
| | ) | **JONATHAN D. GREENBERG** |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Amber Ackerman ("Plaintiff" or "Ackerman"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for Child Disability Benefits, Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In March and May 2021, Ackerman filed an application for Child Disability Benefits, POD, DIB, and SSI, alleging a disability onset date of January 1, 2011, and claiming she was disabled due to bipolar disorder, severe depression, schizophrenia, anxiety, asthma, migraine headaches, and endometriosis.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

(Transcript ("Tr.") 16, 67, 75, 83.)  The applications were denied initially and upon reconsideration, and Ackerman requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 16.)

On March 14, 2022, an ALJ held a hearing, during which Ackerman, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On April 6, 2022, the ALJ issued a written decision finding Ackerman was not disabled.  (*Id.* at 16-35.)  The ALJ's decision became final on December 19, 2022, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On February 6, 2023, Ackerman filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 10.)  Ackerman raises the following issues on judicial review:

> (1)   Whether the ALJ's finding at Step Three is supported by substantial evidence when the ALJ failed to consider SSR 19-4p to determined [sic] if Ms. Ackerman's severe migraine headaches are equal in severity to a listing impairment.
>
> (2)   Whether the ALJ's residual functional capacity finding is supported by substantial evidence when the ALJ unreasonably rejected the medical opinions of record.

(Doc. No. 7.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Ackerman was born in March 1996 and was 25 years-old at the time of her administrative hearing (Tr. 16, 33), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education.  (Tr. 33.)  She has no past relevant work.  (*Id.*)

### B.   Medical Evidence[2]

On March 16, 2017, Ackerman saw primary care physician Scott Kaple, D.O., for follow up of her

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

depression.  (*Id.* at 633.)  Dr. Kaple noted that Ackerman reported her depression had gotten worse.  (*Id.*)  Ackerman told Dr. Kaple she wanted to "break down" every time she was around people and she had stopped Prozac two weeks earlier.  (*Id.*)  Ackerman denied anxiety, suicidal thoughts, mental problems, depression, thoughts of violence, frightening visions or sounds, and homicidal thoughts.  (*Id.* at 635.)  On examination, Dr. Kaple found Ackerman alert and cooperative with a normal mood and affect and normal attention span and concentration.  (*Id.* at 636.)  Dr. Kaple referred Ackerman for counseling and started her on Lexapro.  (*Id.*)  Ackerman's diagnoses consisted of chronic depression and generalized anxiety disorder.  (*Id.* at 636-37.)

On September 21, 2018, Ackerman saw Dr. Kaple for follow up regarding her depression.  (*Id.* at 591.)  Ackerman reported she was still having breakdowns and thought maybe her medication needed to be increased.  (*Id.*)  Ackerman described her depression as "okay" and her anxiety as "bad at times," but she was not suicidal.  (*Id.*)  While Lexapro helped, Ackerman thought she might need a higher dose.  (*Id.*)  On examination, Dr. Kaple found Ackerman alert and fully oriented with a normal mood and affect.  (*Id.* at 593.)  Dr. Kaple noted improved chronic depression and generalized anxiety disorder and increased Ackerman's Lexapro.  (*Id.* at 594.)

On January 18, 2019, Ackerman saw Dr. Kaple for follow up regarding her depression.  (*Id.* at 581.)  Ackerman reported she felt down, and her depression was worse.  (*Id.*)  Her medications were not helping, and she was only sleeping for 30-45 minutes at a time.  (*Id.*)  Ackerman told Dr. Kaple she was waking up with dreams of suicide and self-harm, although she stated she would not commit suicide or hurt herself.  (*Id.*)  She endorsed isolation, negative thoughts, and feeling useless.  (*Id.*)  On examination, Dr. Kaple found Ackerman alert and fully oriented with a normal mood and affect.  (*Id.* at 583.)  Dr. Kaple noted Ackerman's chronic depression had deteriorated, but her generalized anxiety disorder had improved.  (*Id.* at 584.)  Dr. Kaple stopped Seroquel and added Zyprexa.  (*Id.* at 585.)

On March 19, 2019, Ackerman saw Dr. Kaple for follow up regarding her depression.  (*Id.* at 570.)_ Ackerman reported her depression was about the same, but she felt grumpier, and her appetite was up and down.  (*Id.*)  Ackerman endorsed suicidal ideation with no plan and auditory hallucinations of a little girl laughing. (*Id.*)  Dr. Kaple increased Ackerman's Viibryd.  (*Id.* at 574.)

On January 10, 2020, Ackerman saw Nancy Lang, LISW, for counseling.  (*Id.* at 1082.)  Lang noted Ackerman's chief complaints were major depressive disorder and generalized anxiety disorder to rule out bipolar disorder.  (*Id.* at 1083.)  Ackerman reported the holidays were difficult since her grandmother passed away and that she had started a new job on January 6th.  (*Id.* at 1085.)  On examination, Lang found Ackerman appropriately dressed and groomed with normal behavior, normal speech, good mood, mildly constricted affect, logical and goal-directed thought process, non-psychotic thought content, full orientation, fair insight and judgment, normal language, and adequate fund of knowledge. (*Id.* at 1083.)

On February 26, 2020, Ackerman went to the emergency room with complaints of a headache for the past four days that was accompanied by nausea.  (Tr. 904.)  Ackerman rated her pain as a 9/10.  (*Id.*)  She reported a history of headaches, and while Topamax worked at first, it was no longer working.  (*Id.*)  Ackerman told treatment providers Motrin somewhat helped her headache, and she had been able to sleep "comfortably" for the past three nights.  (*Id.*)  Ackerman denied altered vision, jaw claudication, weakness, numbness, and tingling.  (*Id.*)  On examination, treatment providers found Ackerman in no acute distress with normal examination findings.  (*Id.* at 905.)  A CT scan taken that day was normal.  (*Id.*)  Treatment providers administered a migraine cocktail, which did not help Ackerman's headache.  (*Id.*)  Later, treatment providers administered Fioricet, which helped her pain.  (*Id.*)  Treatment providers directed Ackerman to follow up with her neurologist and primary care physician.  (*Id.*)

On February 27, 2020, Ackerman saw Lang for counseling.  (*Id.* at 1096.)  Ackerman reported

having gone to the ER recently for a headache that she could not shake. (*Id.* at 1098.) While Ackerman still had a headache, she was able to work and care for her one-year-old son. (*Id.*) Ackerman reported her new job was going well. (*Id.*) On examination, Lang found Ackerman appropriately dressed and groomed with normal behavior, normal gait, normal speech, good mood, mildly constricted affect, logical and goal-directed thought process, non-psychotic thought content, full orientation, fair insight and judgment, normal language, and adequate fund of knowledge. (*Id.* at 1096-97.)

On March 3, 2020, Ackerman saw Dr. Kaple for follow up after her emergency room visit. (*Id.* at 989.) Ackerman complained of flu-like symptoms, off and on epigastric pain, and a headache that she rated a 6/10. (*Id.*) She reported taking Topamax. (*Id.*) Ackerman told Dr. Kaple that Pepcid was helping her upset stomach. (*Id.*) On examination, Dr. Kaple found Ackerman in no acute distress and normal examination findings. (*Id.* at 990-91.) Dr. Kaple diagnosed Ackerman with chronic tension headache and prescribed Phenergan and Toradol. (*Id.* at 991.)

On June 16, 2020, Ackerman saw Judy Zellner, LPCC, for a telehealth counseling appointment. (*Id.* at 1099.) Zellner noted Ackerman's chief complaint was bipolar affective disorder, mixed, moderate degree. (*Id.* at 1100.) Zellner further noted Ackerman "was upbeat and engaged" in their session that day, and Ackerman had good insight about why she entered therapy in July 2019 and how things had improved since then. (*Id.* at 1101.) Ackerman enjoyed her job, and she had a new boyfriend. (*Id.*) However, Ackerman endorsed continued labile emotions and reported having a "'breakdown'" that past Saturday where she was panicking, crying, rocking, and shaking. (*Id.*) On examination, Zellner found stable mood, a full, congruent affect, normal thought content, full orientation, and intact memory. (*Id.* at 1100.)

On June 18, 2020, Ackerman saw Zellner for follow up. (*Id.* at 1103.) Zellner noted Ackerman was "quite anxious" during their session. (*Id.* at 1104.) Ackerman reported she had just gotten home from work and her children were seeking her attention. (*Id.*) Ackerman told Zellner she felt she was

starting to get burnt out again; while she liked her job, she was working 10 hours a day in addition to being a single mother, which was difficult.  (*Id.*)  On examination, Zellner found an anxious mood, a full, congruent affect, normal thought content, full orientation, and intact memory.  (*Id.* at 1103.)

On June 25, 2020, Ackerman saw neurologist Adam Kapler, D.O., for follow up.  (*Id.* at 1202.)  Dr. Kapler noted he had last seen Ackerman in May 2020, when he increased Topiramate and started Tizanidine.  (*Id.*)  Ackerman complained of pain and tingling in her right hand, as well as numbness, and neck pain.  (*Id.*)  Ackerman also reported getting lightheaded at night.  (*Id.*)  Ackerman denied headaches and migraines.  (*Id.*)  On examination, Dr. Kapler found Ackerman in no acute distress and normal examination findings.  (*Id.*)  Dr. Kapler diagnosed Ackerman with pre-syncope, cervical radiculopathy at C6, cervicogenic headache, and migraine without aura and without status migrainosus, not intractable.  (*Id.*)  Dr. Kapler noted Ackerman had "episodic presyncope that is usually positional, and sometimes with mild disequilibrium but no vertiginous sensations.  This is generally not an issue unless she is bending over and then standing back up."  (*Id.*)  Dr. Kapler found no sensory loss that would be concerning for dysautonomia.  (*Id.*)  Dr. Kapler noted Ackerman had headaches that were "probably migrainous," and "seem[ed] worse when her psychiatric issues act up."  (*Id.*)  Dr. Kapler thought "[m]any of these sound like migraine without aura and others sound more like cervicogenic headaches or occipital neuralgia."  (*Id.*)  Dr. Kapler found no examination findings concerning for cervical compressive myelopathy.  (*Id.*)  Dr. Kapler continued Topiramate, started Ackerman on Tizanidine, and ordered an EMG.  (*Id.* at 1203.)

On July 16, 2020, Ackerman went to the emergency room for complaints of abdominal pain, back pain, and headache.  (*Id.* at 908.)  Ackerman reported her headache had been present for the past three days, and the abdominal pain began yesterday morning.  (*Id.*)  Ackerman described the pain as constant and endorsed nausea and vomiting that had since resolved.  (*Id.*)  Ackerman reported her headaches had been an issue for months.  (*Id.*)  On examination, treatment providers found Ackerman in no acute distress, with a soft, non-tender abdomen, normal bowel sounds, no guarding/rebound tenderness/rigidity, full range of motion of the back, no tenderness to palpation over the thoracic spine or flanks, mild tenderness to the mid lower back region, full range of motion of the extremities, normal strength, and

6

normal neurological examination.  (*Id.* at 909.)  Treatment providers administered an injection for her headache, and Ackerman reported feeling better.  (*Id.* at 909-10.)  Treatment providers noted Ackerman was in stable condition when she left.  (*Id.* at 910.)

On August 4, 2020, Ackerman saw Zellner for follow up.  (*Id.* at 1114.)  Zellner noted Ackerman was anxious during their session.  (*Id.* at 1115.)  Ackerman reported having lost her job because she was sick and missed work.  (*Id.*)  Ackerman told Zellner she had had "'breakdowns'" at every job she had and that she was going to try applying for Social Security.  (*Id.*)  Ackerman endorsed auditory hallucinations where she hears a clicking noise outside her bedroom at night.  (*Id.*)  Zellner noted that "[a]fter reality checking," Ackerman acknowledged it could have been a real noise and not a hallucination.  (*Id.*)  On examination, Zellner found anxious mood, a full, congruent affect, normal thought content, full orientation, and intact memory.  (*Id.* at 1114.)

On August 24, 2020, Ackerman saw Dr. Kapler for review of her EMG.  (*Id.* at 1204.)  Ackerman reported "having a lot of pain in the back of her right arm," as well as pain in her right wrist and fingers.  (*Id.*)  Ackerman told Dr. Kapler she had had some headaches over the weekend, and the headache she had Friday night was "severe and made her feel sick to her stomach."  (*Id.*)  Ackerman continued to complain of neck pain and reported pain in the back of her skull.  (*Id.*)  On examination, Dr. Kapler found Ackerman in no distress with normal muscle bulk, tone, and strength, no tremors, normal reflexes, intact sensation, and normal gait.  (*Id.*)  Dr. Kapler noted Ackerman's EMG was normal.  (*Id.*)  Ackerman's diagnoses consisted of pre-syncope, weakness, cervical radiculopathy at C6, anesthesia of skin, cervicogenic headache, and migraine without aura and without status migrainosus, not intractable.  (*Id.*)  Dr. Kapler noted Ackerman's "symptoms in the right upper extremity seemed to be ulnar nerve related and she has a prominent Tinel sign at the ulnar groove and get sensory symptoms throughout the ulnar distribution in the hand."  (*Id.* at 1205.)  The EMG did not reflect these findings.  (*Id.*)  Dr. Kapler told Ackerman to keep pressure off the inner portion of her elbow and that they would continue to monitor it.  (*Id.*)  Dr. Kapler continued Topiramate at 50 mg twice a day and prescribed Gabapentin for Ackerman's cervical radiculopathy.  (*Id.*)

That same day, Ackerman saw Dr. Kaple and reported Topamax was helping her headaches and

7

that her headaches were "much more rare" and not as constant.  (*Id.* at 995.)

On November 29, 2020, Ackerman saw Upender Gehlot, M.D., for medication management.  (*Id.* at 1079.)  Ackerman reported her mood was "still pervasively irritable" and endorsed continued racing thoughts and psychomotor agitation.  (*Id.*)  Ackerman told Dr. Gehlot she still got very agitated, angry, and upset at everything.  (*Id.*)  Ackerman continued to be hyperverbal and distractible, and reported she sometimes heard voices that told her mean things.  (*Id.*)  Ackerman also complained of feeling like people were out to get her and were watching her.  (*Id.*)  Ackerman reported days where she was down and depressed, and she had excessive fatigue and tiredness where she did not want to do anything and had a hard time taking care of her daily activities.  (*Id.*)  Ackerman endorsed intermittent thoughts of self-harm but denied any suicidal ideation, intent, or plan.  (*Id.*)  Dr. Gehlot noted Ackerman continued to smoke cannabis and did not want to stop smoking.  (*Id.*)  On examination, Dr. Gehlot found Ackerman appropriately dressed and groomed, with restless and less than cooperative behavior, limited eye contact, hyperverbal speech, irritable affect, irritable mood, racing thoughts, full orientation, very limited insight, poor judgment, normal language, and low average fund of knowledge.  (*Id.* at 1080.)

On January 18, 2021, Ackerman saw Chloe Callison, PA-C, for follow up and reported she thought her venlafaxine was interacting with her psychiatric medications.  (*Id.* at 1210.)  Ackerman told Callison she had not taken the venlafaxine since November, and while her migraines were still occurring, they were less frequent and less bothersome.  (*Id.*)  Ackerman reported a severe headache would last for three to four days at a time, and this happened a few times a month.  (*Id.*)  Ackerman endorsed continuing to feel like she was going to pass out, "but this is associated with her severe headaches and have been significantly less frequent."  (*Id.*)  Ackerman told Callison that if she moved her head a certain way, she would get a hot, painful sensation in the back of her head.  (*Id.*)  On examination, Callison found Ackerman in no acute distress and noted normal examination findings.  (*Id.*)  Callison noted Ackerman's presyncope was "[s]eemingly improved with decreased frequency."  (*Id.*)  Callision prescribed Verapamil ER for migraine prevention and noted Ackerman did not tolerate Gabapentin.  (*Id.* at 1211.)

On February 15, 2021, Ackerman saw Zellner for follow up.  (*Id.* at 1128.)  Ackerman reported increased anxiety since her fiancé had moved in with her.  (*Id.* at 1129.)  Her fiancé wanted her to get a

8

job, but Ackerman felt that her mental illness limited her in keeping a job.  (*Id.*)  On examination, Zellner found an anxious mood, anxious, congruent affect, normal thought content, full orientation, and intact memory.  (*Id.* at 1128.)

On March 2, 2021, Ackerman saw Erin Thompson, CNP, to establish care after Dr. Gehlot left.  (*Id.* at 1131.)  Ackerman reported her primary care physician had started her back on Lexapro because she was having suicidal thoughts, but she wasn't taking the medication and continued to have some sicidal thoughts.  (*Id.*)  Ackerman endorsed irritability, racing thoughts, inability to sit still, bursts of energy where she will clean her house and make it spotless, and weekly auditory hallucinations.  (*Id.* at 1132.)  On examination, Thompson found Ackerman appropriately dressed and groomed with normal behavior, normal speech, fair mood, mildly constricted affect, logical and goal-directed thought process, non-psychotic thought content, full orientation, fair insight and judgment, normal language, and adequate fund of knowledge.  (*Id.*)  Thompson restarted Abilify and started Lamictal.  (*Id.* at 1133.)

On April 6, 2021, Ackerman saw Thompson for follow up.  (*Id.* at 1141.)  Ackerman reported she was back on Lamictal and was having visual hallucinations in a dream.  (*Id.*)  She could not remember the dreams and she was not sleeping well since starting Lamictal.  (*Id.*)  Ackerman endorsed an irritable, depressed mood and poor sleep, but denied suicidal thoughts.  (*Id.*)  On examination, Thompson found Ackerman appropriately dressed and groomed with normal behavior, normal speech, fair mood, mildly constricted affect, logical and goal-directed thought process, non-psychotic thought content, full orientation, fair insight and judgment, normal speech, and adequate fund of knowledge.  (*Id.* at 1142-43.)  Thompson stopped Lamictal and increased Abilify.  (*Id.* at 1143.)

On April 12, 2021, Ackerman saw Dr. Kapler for follow up.  (*Id.* at 1212.)  Dr. Kapler noted Ackerman had last been seen on March 11, 2021, when she had been started on Emgality.  (*Id.*)  Ackerman reported her insurance would not cover Emgality.  (*Id.*)  Ackerman endorsed four migraines a week, although they were less severe, and described the pain as located in the back of her head, right sided, and around the optic nerve.  (*Id.*)  Ackerman also reported tolerable dizziness and lightheadedness when going from sitting to standing.  (*Id.*)  On examination, Dr. Kapler found Ackerman in no acute distress and noted normal examination findings.  (*Id.*)  Dr. Kapler noted Ackerman's migraines were

9

"exacerbated by stressors and lack of sleep." (*Id.*)  Ackerman had chronic insomnia.  (*Id.*)  As Ackerman reported an average of four headaches a week, she was having 15+ headaches a month.  (*Id.*)  Dr. Kapler noted Ackerman's positional episodic presyncope had "spontaneously improved to a large extent."  (*Id.*)  Dr. Kapler now suspected Ackerman's right upper extremity symptoms were musculoskeletal in nature.  (*Id.* at 1213.)  Dr. Kapler noted right occipital neuralgia and prescribed Depakote.  (*Id.*)

On April 15, 2021, Ackerman saw Erin Thompson, PMHNP, for a behavioral health consultation.  (*Id.* at 1531, 1536.)  Ackerman reported being tired over the past two weeks and that she needed to get her anger under control.  (*Id.* at 1531.)  Ackerman used CBD on occasion.  (*Id.*)  She stopped using Lamictal because of vivid dreams, and she had not had any dreams since stopping the Lamictal.  (*Id.*)  Thompson noted Ackerman was going to start Depakote on Monday.  (*Id.*)  On examination, Thompson found appropriate dress, adequate grooming and hygiene, cooperative behavior, good eye contact, normal psychomotor activity, euthymic mood that was irritable at times, congruent affect, organized and logical thought process, intact insight and judgment, good attention, and full orientation.  (*Id.* at 1534.)  Ackerman's diagnoses consisted of bipolar disorder, current episode hypomanic, and anxiety.  (*Id.* at 1535.)

On April 30, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1538.)  Ackerman reported taking Buspar morning and evening and taking Abilify at bedtime.  (*Id.*)  She still woke up tired and was either groggy all day or had bouts of energy before going back to being tired.  (*Id.*)  Ackerman struggled to fall asleep, although she stayed asleep once she fell asleep.  (*Id.*)  She reported her mood and depression had been better, she did not get anxious around people, and she still could get irritable around people.  (*Id.*)  On examination, Thompson found normal speech, euthymic mood that was irritable at times, organized, goal-directed thought process, normal thought content, intact insight and judgment, intact memory, and full orientation.  (*Id.* at 1538-39.)  Thompson started Ackerman on Vistaril and increased Abilify.  (*Id.* at 1539.)

On May 12, 2021, Ackerman saw PA-C Callison for follow up.  (*Id.* at 1214.)  Ackerman reported "doing okay" since her last visit; although the Depakote was causing "significant[] fatigue[]," taking it at night helped.  (*Id.*)  Ackerman reported having a headache that day and told Callison she got three

10

headaches a week, which had decreased "quite a bit." (*Id.*)  Ackerman tried to stop her headaches before they became migraines.  (*Id.*)  She continued to endorse dizziness, seeing spots with dizziness, and sharp pain in the back of her right leg.  (*Id.*)  Ackerman also complained of pain from her neck to her shoulder on the right, which Dr. Kaple told her was impingement syndrome.  (*Id.*)  On examination, Callison found Ackerman in no distress and noted normal examination findings.  (*Id.*)  While Ackerman experienced significant improvement of her migraines with Emgality, it was not covered by insurance, and while she noted improvement with Depakote, she was not tolerating it well.  (*Id.*)  Callison noted Ackerman's migraines lasted "4+ hours without treatment." (*Id.*)  Callison stopped Depakote and started Ackerman on Ajovy injections.  (*Id.* at 1215.)

On May 14, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1542.)  Ackerman reported taking Vistaril every day, but it was not helping with her sleep.  (*Id.*)  While her anxiety was better, Ackerman stated she had been in a more down/depressed mood lately.  (*Id.*)  While Ackerman's mood had been down, her energy and motivation were stable, her concentration was intact without distractibility, and she had goal-oriented behavior with good follow through.  (*Id.*)  Thompson noted Ackerman's depressive symptoms were present, and her "[p]ervasive irritability is controlled today." (*Id.*)  On examination, Thompson found normal speech, a content mood that was down at times, normal thought process, normal thought content, intact insight and judgment, intact memory, and full orientation.  (*Id.* at 1543-44.)  Thompson noted Ackerman was stable and increased Abilify.  (*Id.* at 1544.)

On May 28, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1549.)  Ackerman reported doing better with the increased dose of Abilify, although she had been told to stop taking Vistaril since it wasn't helping.  (*Id.*)  Ackerman endorsed a stable mood, stable energy and motivation, difficulty falling asleep, intact concentration without distractibility, and goal-oriented behavior with good follow through.  (*Id.*)  Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, or euphoria.  (*Id.*)  Ackerman reported experiencing anxiety only in social situations or talking to new people.  (*Id.*)  Thompson noted "[p]ervasive irritability is controlled today" and that Ackerman's meaningful relationships were intact.  (*Id.*)  On examination, Thompson found normal speech, a euthymic and content mood, organized, goal-directed thought process, normal thought content,

cooperative attitude, intact insight and judgment, intact memory, and full orientation.  (*Id.* at 1550-51.) Thompson noted Ackerman was stable.  (*Id.* at 1551.)

On June 23, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1554.)  Ackerman reported Buspar didn't seem to be working, as she was still anxious, nervous around people, and "'getting the shakes.'"  (*Id.*)  Ackerman also endorsed more down/depressed days where she did not have the motivation to do anything; when she did have energy, she started cleaning but then didn't want to finish cleaning.  (*Id.*)  Ackerman also complained of trouble falling asleep.  (*Id.*)  Thompson noted Ackerman was "doing well, taking meds daily, and tolerating well."  (*Id.*)  While Ackerman's mood had been fluctuating, her energy and motivation were stable, and her concentration was intact without distractibility. (*Id.*)  Thompson noted Ackerman's depressive symptoms were persistent, and her "[p]ervasive irritability is not controlled today."  (*Id.*)  Thompson further noted anxiety.  (*Id.*)  On examination, Thompson found cooperative behavior, good eye contact, normal psychomotor activity, normal speech, euthymic mood that was irritable at times, congruent affect, organized and logical thought process, normal thought content, intact insight and judgment, good attention, and cooperative attitude.  (*Id.* at 1556.)  Thompson stopped Abilify and started Geodon.  (*Id.* at 1557.)

On July 7, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1559.)  Ackerman reported the Geodon was not working yet, she was still having trouble falling asleep, and her mood had gotten worse.  (*Id.*)  Ackerman endorsed a fluctuating mood, stable energy and motivation, intact concentration without distractibility, goal-oriented behavior with good follow through, and persistent depressive symptoms.  (*Id.*)  Ackerman denied sadness, anhedonia, isolating behaviors, crying spells, anxiety, and euphoria.  (*Id.*)  Thompson noted "[p]ervasive irritability is not controlled today."  (*Id.*) Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*)  On examination, Thompson found normal speech, irritable mood, goal-directed and organized thought process, normal thought content, good-fair and intact insight and judgment, cooperative attitude, full orientation, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1560-61.)  Thompson noted Ackerman was stable and increased Geodon.  (*Id.* at 1561.)

On July 21, 2021, Ackerman saw Dr. Kapler and reported "her migraines [were] doing well with

the Ajovy." (*Id.* at 1216.) Ackerman told Dr. Kapler she was getting milder headaches and not as many severe migraines, and she denied feeling lightheaded or like she may pass out. (*Id.*) Ackerman complained of a sore neck and stated she was having a harder time putting her right arm behind her as she would get pain in her shoulder, but she denied numbness and tingling in the arms. (*Id.*) On examination, Dr. Kapler found Ackerman in no distress and noted normal examination findings. (*Id.*) Dr. Kapler continued Ajovy and started Sumatriptan. (*Id.* at 1217.) Dr. Kapler noted Ackerman may need orthopedic evaluation of her shoulder. (*Id.*)

On July 22, 2021, Ackerman saw PMHNP Thompson for follow up. (*Id.* at 1564.) Ackerman reported she was still taking 10 mg of Buspar, she had been stressed out, she felt Geodon wasn't working, and she could not fall asleep at night when she took it, which caused her to wake up tired. (*Id.*) Ackerman endorsed a fluctuating mood, stable energy and motivation, intact concentration without distractibility, goal-oriented behavior with good follow through, persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and anxiety. (*Id.*) Ackerman denied euphoria. (*Id.*) Thompson noted "[p]ervasive irritability is not controlled today," anxiety was occurring, and Ackerman was only taking 15mg of Buspar. (*Id.*) Thompson further noted Ackerman's meaningful relationships were intact. (*Id.*) On examination, Thompson found normal speech, irritable mood, goal-directed and organized thought process, normal thought content, good-fair and intact insight and judgment, cooperative attitude, full orientation, intact memory, low aggression, low anger control, and good-fair impulse control. (*Id.* at 1565-66.) Thompson noted Ackerman was stable and increased Geodon. (*Id.* at 1566.)

On August 17, 2021, Ackerman saw PMHNP Thompson for follow up. (*Id.* at 1569.) Ackerman reported she did not think the Geodon was working, she was still having trouble falling asleep and feeling tired in the morning, and she was still getting anxious around people. (*Id.*) Ackerman endorsed an irritable mood, stable energy and motivation, intact concentration without distractibility, and goal-oriented behavior with good follow through. (*Id.*) Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, anxiety, and euphoria. (*Id.*) Thompson noted "[p]ervasive irritability is not controlled today" but it had improved. (*Id.*) Thompson further noted Ackerman's meaningful relationships were intact. (*Id.*) Ackerman wanted to continue her current treatment plan. (*Id.*)

13

Ackerman reported her anxiety was still bad and she tried to isolate herself when she was around a lot of people.  (*Id.*)  On examination, Thompson found normal speech, an anxious and irritable mood, goal-directed and organized thought process, normal thought content, good-fair and intact insight and judgment, cooperative attitude, full orientation, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1570-71.)  Thompson noted Ackerman was stable and increased Geodon.  (*Id.* at 1571.)

On August 31, 2021, Ackerman saw Dr. Kaple for stomach pain and reported that Ajovy had improved her migraine symptoms.  (*Id.* at 1306-07.)  Dr. Kaple noted, "Ajovy helping her greatly."  (*Id.* at 1309.)

On September 2, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1574.)  Ackerman reported she had "been getting 'shakes'" and vivid dreams, she had "been raging," and she had not been sleeping.  (*Id.*)  Ackerman endorsed a fluctuating mood, stable energy and motivation, intact concentration without distractibility, goal-oriented behavior with good follow through, persistent depressive symptoms, sadness, anhedonia, isolating behaviors, and crying spells.  (*Id.*) Ackerman denied euphoria and anxiety.  (*Id.*)  Thompson noted "[p]ervasive irritability is not controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*)  On examination, Thompson found normal speech, an anxious and irritable mood, goal-directed and organized thought process, normal thought content, good-fair and intact insight and judgment, cooperative attitude, full orientation, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1575-76.)  Thompson noted Ackerman was stable, increased Geodon, and added Vraylar.  (*Id.* at 1576.)

On October 5, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1584.)  Ackerman reported she had stopped taking Buspar because it was making her anxiety worse, she did not feel like Vraylar was helping as she was "still raging/angry and irritable," and her anxiety made her shaky.  (*Id.*)  Ackerman endorsed a fluctuating mood, no energy or motivation, persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and anxiety.  (*Id.*) Ackerman denied euphoria.  (*Id.*)  Thompson noted "[p]ervasive irritability is not controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact and she was attending work as scheduled.  (*Id.*)  On

14

examination, Thompson found cooperative behavior, coherent thought, calm affect, good-fair insight and judgment, good eye contact, normal speech, mixed mood, mildly constricted affect, organized and logical thought process, good attention, full orientation, low aggression, low anger control, and good impulse control.  (*Id.* at 1585-86.)  Thompson directed Ackerman to wean off Vraylar and start Rexulti.  (*Id.* at 1587.)

That same day, Thompson completed a mental residual functional capacity assessment. (*Id.* at 1392-94.)  Thompson reported treating Ackerman on a bi-weekly basis for her bipolar disorder and anxiety since April 15, 2021. (*Id.* at 1392.)  Thompson noted Ackerman's medication was still being adjusted.  (*Id.*)  Thompson opined that Ackerman would be off task more than twenty-five percent of an eight-hour workday, she would be absent a minimum of 4-5 days per month, and because of "increased anxiety," Ackerman was unable to properly perform job functions and would not be able to sustain an eight-hour workday five days a week.  (*Id.* at 1392-93.)  Thompson further opined Ackerman had extreme limitations in her abilities to: work with others; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday/work week without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id.* at 1393-94.)  Thompson further opined Ackerman would have marked limitations in her abilities to: interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independent of others.  (*Id.*)

On October 20, 2021, Ackerman saw Dr. Kapler for follow up and reported that while she had run out of Sumatriptan, it had worked well to abort her migraines.  (*Id.* at 1399.)  Ackerman continued to receive Ajovy injections, but she was having two to three migraines a week again as well as lightheadedness.  (*Id.*)  Ackerman also complained of a sore neck and paresthesias in her entire arm depending on how she lays.  (*Id.*)  Dr. Kaple told Ackerman she had a right shoulder sprain.  (*Id.*)  On examination, Dr. Kapler found Ackerman in no distress and noted normal examination findings.  (*Id.*)  Dr.

Kapler noted that "[r]ecent stressors and continued sleep issues" were exacerbating Ackerman's headaches recently.  (*Id.* at 1400.)  Dr. Kapler continued Ajovy and increased Sumatriptan.  (*Id.*)  Dr. Kapler noted they may consider Botox.  (*Id.*)

On November 4, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1594.) Ackerman reported she was "doing okay" but she felt like she had been having more "down days" since starting Rexulti and her anxiety was still high.  (*Id.*)  Ackerman endorsed a fluctuating mood, no energy or motivation, intact concentration without distractibility, persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and anxiety.  (*Id.*)  Ackerman denied euphoria.  (*Id.*) Thompson noted "[p]ervasive irritability is not controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*)  On examination, Thompson found normal speech, a down, anxious mood, goal-directed and organized thought process, cooperative attitude, full orientation, normal speech, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1595-96.)  Thompson noted Ackerman was stable and increased Rexulti.  (*Id.* at 1596.)

On November 29, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1599.) Ackerman reported having "quite a few down days" and her anxiety was "still 'through the roof.'"  (*Id.*) Ackerman endorsed a fluctuating mood, no energy or motivation, intact concentration without distractibility, and anxiety.  (*Id.*) Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and euphoria.  (*Id.*)  Thompson noted "[p]ervasive irritability is controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*) On examination, Thompson found normal speech, a down, anxious mood, goal-directed and organized thought process, cooperative attitude, full orientation, normal speech, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1600-01.) Thompson noted Ackerman was stable and increased Rexulti.  (*Id.* at 1601.)

On December 20, 2021, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1603.) Ackerman reported her anxiety was "'through the roof.'"  (*Id.*)  Ackerman endorsed a fluctuating mood, stable energy and motivation, intact concentration without distractibility, and anxiety.  (*Id.*) Ackerman

denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and euphoria. (*Id.*) Ackerman reported "starting to panic" when she got into a vehicle. (*Id.*) Thompson noted "[p]ervasive irritability is controlled today." (*Id.*) Thompson further noted Ackerman's meaningful relationships were intact. (*Id.*) On examination, Thompson found normal speech, a down, anxious mood, goal-directed and organized thought process, cooperative attitude, full orientation, normal speech, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-fair impulse control. (*Id.* at 1605-06.) Thompson noted Ackerman was stable, continued Rexulti, and added Effexor. (*Id.* at 1606.)

On January 18, 2022, Ackerman saw Dr. Kaple for follow up. (*Id.* at 1469.) Ackerman reported her anger, headaches, and GERD were much better. (*Id.*) Ackerman complained of right-sided sciatica which was worse with bending and walking. (*Id.*) On examination, Dr. Kaple found normal toe and heel walking, positive straight leg raise test on the right, negative straight leg raise test on the left, sciatic notch tenderness on the right, normal range of motion, and grossly normal neurologic examination. (*Id.* at 1469-71.) Dr. Kaple noted Ackerman reported her migraines were better, as she was only getting one a week now, and Ajovy was helping. (*Id.* at 1471.) Dr. Kaple further noted what while Ackerman's anxiety was "still thru the roof," her anger, depression, and mood swings were "much better" on a higher dose of Rexulti. (*Id.*)

That same day, Ackerman saw PMHNP Thompson for follow up. (*Id.* at 1609.) Ackerman reported her mood was better, although her anxiety was still high, and she had noticed leg shaking and vivid dreams since starting Effexor. (*Id.*) Ackerman endorsed a stable mood, stable energy and motivation, intact concentration without distractibility, good sleep, feeling rested, and anxiety. (*Id.*) Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and euphoria. (*Id.*) Thompson noted "[p]ervasive irritability is controlled today." (*Id.*) Thompson further noted Ackerman's meaningful relationships were intact. (*Id.*) On examination, Thompson found normal speech, anxious mood, goal-directed and organized thought process, cooperative attitude, full orientation, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-

fair impulse control.  (*Id.* at 1611.)  Thompson noted Ackerman was stable and continued Effexor.  (*Id.*)

Also on that same day, Thompson completed another mental residual functional capacity assessment setting forth the same opinions as the one she completed in October 2021.  (*Id.* at 1617-19.)

On January 31, 2022, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1747.)  Ackerman reported her anxiety was still high and her leg was still shaking.  (*Id.*)  Ackerman endorsed a stable mood, stable energy and motivation, intact concentration without distractibility, and anxiety.  (*Id.*)  Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and euphoria.  (*Id.*)  Thompson noted "[p]ervasive irritability is controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*)  On examination, Thompson found normal speech, a content, anxious mood, normal thought process, cooperative attitude, full orientation, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1749.)  Thompson noted Ackerman was stable and increased Effexor.  (*Id.* at 1749-50.)

On February 22, 2022, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1765.)  Ackerman reported she had been doing "pretty good" but had been angrier.  (*Id.*)  Ackerman endorsed a stable mood, stable energy and motivation, sleeping through the night, feeling rested, and intact concentration without distractibility.  (*Id.*)  Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, euphoria, anxiety, and increased goal-oriented behavior or purposeless activity.  (*Id.*)  Thompson noted "[p]ervasive irritability is controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*)  Ackerman reported getting angry once a day, with the length of time depending on the situation, and that her anger was triggered.  (*Id.*)  Ackerman continued to experience leg shaking when she was anxious.  (*Id.*)  Thompson noted Ackerman wanted to continue her current treatment plan.  (*Id.*)  On examination, Thompson found normal speech, a content mood that was irritable at times, normal thought process, cooperative attitude, full orientation, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1766-67.)  Thompson noted Ackerman was stable and increased Effexor.  (*Id.* at 1767.)

On March 8, 2022, Ackerman saw PMHNP Thompson for follow up.  (*Id.* at 1773.)  Ackerman reported she had been "raging and angry more often lately" and she was having trouble controlling this.

(*Id.*)  Ackerman endorsed a fluctuating mood, elevated energy and motivation, sleeping through the night, feeling rested, intact concentration without distractibility, and increased goal-oriented behavior or purposeless activity.  (*Id.*)  Ackerman denied persistent depressive symptoms, sadness, anhedonia, isolating behaviors, crying spells, and euphoria.  (*Id.*)  Ackerman reported continued but improved anxiety.  (*Id.*)  Thompson noted "[p]ervasive irritability is not controlled today."  (*Id.*)  Thompson further noted Ackerman's meaningful relationships were intact.  (*Id.*)  On examination, Thompson found normal speech, a content mood that was irritable at times, normal thought process, cooperative attitude, full orientation, good-fair judgment and insight, intact memory, low aggression, low anger control, and good-fair impulse control.  (*Id.* at 1775.)  Thompson noted Ackerman was stable and increased Rexulti.  (*Id.* at 1775-76.)

## C.    State Agency Reports

### 1.    Mental Impairments

On July 5, 2021, Cindy Matyi, Ph.D., reviewed the file and opined Ackerman had a mild limitation in her ability to understand, remember, or apply information and moderate limitations in her abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 69-70.) Dr. Matyi further opined Ackerman had the residual functional capacity to: comprehend and remember a variety of task instructions; carry out simple (1-2 step) and occasional complex/detailed (3-4 step) tasks; maintain attention; make simple decisions; and adequately adhere to a schedule.  (*Id.* at 71-72.)  Dr. Matyi opined Ackerman "[w]ould need a relatively isolated workstation and supervisory support when first learning job tasks."  (*Id.* at 72.)  While Ackerman was "susceptible to misinterpreting interpersonal nuance," she could "relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny."  (*Id.*) While her symptoms would be exacerbated "in the face of perceived stressors," Ackerman could adapt to a setting where duties were routine and predictable and where changes were infrequent, explained in advance, and introduced slowly.  (*Id.*)

On November 2, 2021, on reconsideration, Cynthia Waggoner, Psy.D., affirmed Dr. Matyi's findings.  (*Id.* at 96-97, 99-100.)

### 2.  Physical Impairments

On August 25, 2021, Leslie Green, M.D., reviewed the file and found no severe physical impairments and no physical medically determinable impairments.  (*Id.* at 68-69.)

On November 17, 2021, on reconsideration, Dmitri Teague, M.D., affirmed Dr. Green's findings. (*Id.* at 95-96.)

### D.  Hearing Testimony

During the March 14, 2022 hearing, Ackerman testified to the following:

- She lives with her fiancé, daughter, and son.  (*Id.* at 48.)  Her oldest is ten and her youngest is three.  (*Id.*)

- She left her last job because she was having "really bad breakdowns" because of her assistant manager.  (*Id.* at 49.)  She felt like he was judging her, and he made her feel like she wasn't doing her job properly, even though she was.  (*Id.*)  He was unhappy with her work.  (*Id.*)  She gets anxious and nervous and starts to panic when she works with males because of her PTSD.  (*Id.*)  Her breakdowns consist of her walking away from the situation without telling anyone.  (*Id.* at 58.)  She would end up crying and would get "testy" with her assistant manager.  (*Id.*)  She would not know how to handle the situation and it would cause her to be anxious.  (*Id.*)  She was not being medicated properly, as she was only being treated for depression and not bipolar disorder.  (*Id.*)  At another job she stated panicking around customers.  (*Id.* at 51.)

- She has never been psychiatrically hospitalized, although they had talked about doing that.  (*Id.*)  She had nobody to take care of her children if she went.  (*Id.*)  She takes medication for her mental health impairments, and her treatment provider just increased her medication.  (*Id.* at 52.)  Some days the medication helps, some days it doesn't.  (*Id.*)  Some days she struggles to remember to take her medication.  (*Id.*)  It just depends on her mood and how she wakes up in the morning.  (*Id.*)

- Her memory is poor but her ability to concentrate is fair.  (*Id.*)  Sometimes she can concentrate and sometimes she can't.  (*Id.*)  She has a hard time focusing on one thing.  (*Id.*)  She has issues getting along with others.  (*Id.*)  She gets anxious talking to new people and panics.  (*Id.*)  Sometimes she just avoids people altogether because she gets so anxious and nervous around them.  (*Id.* at 52-53.)  Sometimes she gets panic attacks where her heart races and it feels like her heart is going to jump out of her chest because she does not know how to handle a situation with people.  (*Id.* at 53.)

She pretty much stays in the house and does not go out. (*Id.*) She panics if she goes into stores. (*Id.*)

- She was getting migraine headaches every day that would last anywhere from three to five days. (*Id.*) Now she takes Ajovy once a month at the beginning of the month, and she gets one headache a week now. (*Id.*) She also takes another medication for her headaches. (*Id.*) Her migraine only lasts about a day and a half now. (*Id.* at 54.) Loud noises and certain kinds of music trigger her migraines. (*Id.*) Loud noises and bright lights cause her headaches and make them severe. (*Id.*) She started taking Ajovy last year. (*Id.*) When she gets a headache, she gets fatigued and light-headed, and she experiences light sensitivity, nausea, and irritability. (*Id.* at 55.) She avoids noise, she turns off the lights, and takes her one medication for onset headaches. (*Id.*) If that doesn't work, she takes Tylenol. (*Id.*) If that doesn't work, she lays on the couch and blocks out all the noise and light. (*Id.*) She does not have any side effects from Ajovy or any of her other medications. (*Id.* at 56.)

- She spends seven days a month laying on the couch unable to get up. (*Id.*) Her depression causes her to just lay around and not move. (*Id.*) She tries to isolate herself. (*Id.*) She will go to her room and try to stay there. (*Id.*) She will avoid people and not get out of bed. (*Id.*) Her depression and bipolar disorder sometimes cause her to be frustrated or angry, and she will sit on the couch and ignore people so she does not blow up on anybody. (*Id.*) She stays there for about an hour. (*Id.*) When she is lying on the couch and not able to do anything, her fiancé takes care of her children. (*Id.*) When she feels better, she will get a burst of energy and clean the whole house, so everything is done before she goes to bed. (*Id.* at 57.) That way, if she wakes up depressed or angry, she knows her house is done. (*Id.*)

- She tries to help her daughter with her schoolwork, but it is difficult for her, and she can't stay focused enough to know what she's reading. (*Id.*)

- She still has anger problems, and her treatment provider increased her mood stabilizer recently. (*Id.* at 58.)

- Her biggest problem if she was back in a job situation would be her anxiety and her bipolar disorder. (*Id.*) Somebody would say something, she would take it the wrong way and get angry, and she wouldn't know how to control it. (*Id.*)

The ALJ found Ackerman had no past relevant work. (*Id.* at 60.) The ALJ then posed the following hypothetical question:

> I'm going to ask a few hypothetical questions. Please assume that when I use the term frequent, occasional, and constant, I'm using them as defined in the DOT and the SCO and the Social Security Act rules and regulations. So, for the first hypothetical, please assume a hypothetical individual with the same age, education, and vocational profile as the claimant with a residual functional capacity to perform light work, except she can never climb ladders, ropes, or

21

> scaffolds.  She can occasionally push and pull with the bilateral upper
> extremities.  She should avoid workplace hazards, such as unprotected heights
> and moving mechanical parts.  She should avoid more than occasional exposure
> to loud noise, such as defined in the <u>DOT</u>.  Is there any work that could be
> performed in the [INAUDIBLE]?

(*Id.*)  After some questioning by the VE, the ALJ eliminated occasional pushing and pulling with the

bilateral upper extremities.  (*Id.*)

The VE testified the hypothetical individual would be able to perform other representative jobs in

the economy, such as electronics worker, mail room clerk, and merchandise marker.  (*Id.* at 60-61.)

The ALJ then posed an additional hypothetical:

> And if I were to ask if an individual is limited to simple tasks in a routine work
> setting but not at a production-rate pace.  For example, no assembly line work.
> And she is limited to occasional changes in the workplace that are well-
> explained and occasional interaction with supervisors, coworkers, and the
> general public.  Does that have any impact on the jobs you provided? And how
> about if there were to be no interaction with the general public?  Would that
> have any impact on the jobs you provided?

(*Id.* at 61.)

The VE testified that no public interaction would preclude competitive employment.  (*Id.*)  If the

hypothetical individual needed to work in isolation, there would be no jobs.  (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of

disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

determinable physical or mental impairment," or combination of impairments, that can be expected to

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she

became disabled; and (3) she filed while she was disabled or within twelve months of the date the

disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

22

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Ackerman was insured beginning on January 1, 2015,[3] and remains insured through June 30, 2025, her date last insured ("DLI").  (Tr. 16-17.) Therefore, in order to be entitled to POD and DIB,

---

[3] While Ackerman alleged a disability onset date of January 1, 2011, she had acquired sufficient quarters of coverage to be insured only beginning on January 1, 2015.  (Tr. 16.)  Furthermore, since Ackerman

Ackerman must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2025.

2.  Born on March **, 1996, the claimant had not attained age 22 as of January 1, 2011, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

3.  The claimant has not engaged in substantial gainful activity since March 29, 2014 (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

4.  The claimant has the following severe impairments: bipolar I disorder; anxiety disorder; major depressive disorder; migraine headaches; and obesity (20 CFR 404.1520(c) and 416.920(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: She can never climb ladders, ropes, or scaffolds.  She should avoid workplace hazards such as unprotected heights and moving mechanical parts.  She should avoid more than occasional exposure to loud noise such as defined in the Dictionary of Occupational Titles (DOT).  She is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work.  She is limited to occasional changes in the workplace that are well explained and occasional interaction with supervisors, coworkers, and the general public.

7.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on March **, 1996 and was 18 years old, which is defined as a younger individual age 18-49, on March 29, 2015 (20 CFR 404.1563 and 416.963).

---

turned 18 in March 2014, she only became eligible for disabled child's insurance benefits on that date. (*Id.*)  Therefore, the period being adjudicated in the ALJ's decision began in March 2014.  (*Id.*)

9.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 19-34.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different

conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Step Three**

In her first assignment of error, Ackerman argues that while the ALJ found her migraine headaches to be a severe impairment, "the ALJ unreasonably failed to consider whether [her] headaches are equal in severity to a listed impairment."  (Doc. No. 7 at 11.)  Ackerman asserts she "has presented evidence that her migraine headaches are equal in severity and duration to the requirements of listing 11.02B."  (*Id.* at 12.)  Therefore, Ackerman maintains, "[t]he ALJ's failure to consider whether [her] migraine headaches are equal in severity to a listed impairment renders the ALJ's decision unsupported by substantial evidence."  (*Id.* at 13.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Ackerman did not equal Listing 11.02.  (Doc. No. 10 at 6.)  The Commissioner argues that "even though the ALJ did not expressly consider whether Plaintiff's headaches medical [sic] equaled Listing 11.02 (though the ALJ did generally consider Listing 11.02 (Tr. 21)), her decision is supported by substantial evidence."  (*Id.* at 6-7.)  The Commissioner asserts that Ackerman failed to meet her burden of showing her headaches equaled Listing 11.02B, as she "fails to include *any* description from an acceptable medical source of a typical headache event, much less one including *all* associated phenomena and limitations" as required by SSR 19-4p.  (*Id.* at 7) (emphasis in original).  Instead, Ackerman "simply recites subjective complaints of headaches contained in the record while acknowledging her headaches improved in both severity and frequency once starting Ajovy in 2021."  (*Id.* at 7-8.)  In addition, the state agency reviewing sources found Ackerman did not meet or equal any listing, and she "does not and cannot show any medical source opinion in the record suggesting otherwise."  (*Id.* at 8.)  The Commissioner argues that the fact Ackerman reported having multiple headaches or migraines a week at certain times since her alleged

disability onset date "is irrelevant because there is no evidence that they were of equal severity to a dyscognitive seizure." (*Id.*)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 40.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed

28

Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17.

Primary headache disorders are not included in the listed impairments. However, a listing is medically equaled if "a primary headache disorder, alone or in combination with other impairment(s), medically equals a listing." SSR 19-4p, 2019 WL 4169635, at *7. The SSR instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for an MDI of a primary headache disorder. In pertinent part, Listing 11.02B involves "Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)." 20 C.F.R. Part 404, Subpart P, App.1, § 11.02. In determining whether a claimant's impairments are equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Here, at Step Two, the ALJ determined Ackerman suffered from the severe impairment of migraine headaches. (Tr. 20.) At Step Three, the ALJ determined Ackerman's impairments did not meet or medically equal the requirements of a Listing, explaining in part as follows:

> The undersigned examined and considered all listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, with specific attention to Listings 11.02 (Epilepsy), 12.04 (Depressive, bipolar and related disorders), and 12.06 (Anxiety and obsessive-compulsive disorders). Obesity and its effects were also considered when evaluating disability, as the combined effects of obesity can

29

increase the effects of other impairments (Social Security Ruling 19-2p). However, the undersigned concludes the medical evidence did not demonstrate the claimant's impairments rose to the level of listing level severity, and that no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

In particular, neurology examinations consistently showed the claimant was in no distress with a normal spinal curvature, normal work breathing, her attention normal, her speech fluent, her pupils equal, reactive and/or consensual, ocular motility full, facial sensation normal, muscle bulk, tone and strength normal, reflexes normal, light touch normal, vibratory sensation normal, rapidly-alternating movements normal, stance normal, gait normal and posture stable (Exhibit 2F/323-325, 331-335, 5F/4-6, 12-18, 7F/5, 10F/13). Family medicine examinations were also consistently benign with the claimant alert, oriented and in no acute distress with her oxygen saturation (SpO2) 94 percent or higher, her respiratory effort normal, her lungs clear to auscultation, her heart rate and rhythm regular, her joints normal, musculoskeletal range of motion normal including both the upper and lower extremities, her neurological exam grossly intact and her mood and affect normal at appointments (Exhibits 2F/5-6, 11-12, 16, 21, 26-49, 68-69, 94-114, 120-169, 384-460, 5F/110, 126, 131-137 and 10F/64-65). As a result, the claimant does not meet Listing 11.02.

(*Id.* at 21.)

Here, while the ALJ did not specifically mention Ackerman's headaches in discussing Listing 11.02, the ALJ considered the relevant listing and Ackerman's treatment records from her neurologist, whom she saw for treatment of her headaches in addition to other impairments, at Step Three. Therefore, contrary to Ackerman's argument, the ALJ considered whether her migraine headaches equaled a listed impairment.

However, even assuming the ALJ's Step Three analysis was insufficient, the Sixth Circuit has found that remand is not required where the error is harmless. *See, e.g., Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-366 (6th Cir. 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). *See also Ison*, 2017 WL 4124586, at **5-6; *Cygan v. Comm'r of Soc. Sec.*, Case No. 14-14356, 2016 WL 1128087, at **2-3 (E.D. Mich. March 23, 2016); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at **5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at **3-4 (E.D. Tenn.

March 26, 2015).  Specifically, a court may find an ALJ's failure to adequately discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."  *Forrest*, 591 F. App'x at 366.  *See Bledsoe,* 165 F. App'x at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 F. App'x at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison*, 2017 WL 4124586, at *5 (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec.*, Case No. 2:16-cv-57, 2017 WL 1324609, at **2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

In the RFC analysis, the ALJ extensively discussed Ackerman's headaches (Tr. 29-33) and noted evidence that undercut a finding of disability, including:

- Normal findings on examination.

- Notations that Ackerman was in no acute distress.

- Notations that Ackerman denied having migraines/headaches.

- Improvement with medication.

(*Id.* at 29-30.)  The ALJ also rejected the state agency physicians' determination that Ackerman had no severe medically determinable physical impairment, finding that Ackerman "required treatment for her migraines with a specialist in neurology and, although the treatment was helpful, she still related she

31

experienced migraines and/or headaches at times (Exhibits 2F/331-337, 428-430, 5F/4, 12, 18, 109 and 10F/13, 64)." (*Id.* at 32.)  The ALJ further found as follows:

> Consequently, although the neurology examinations consistently revealed the claimant had no deficits due to the headaches, the claimant's need for specialized treatment supports that the claimant's migraines cause more than a minimal limitation on the claimant's ability to perform work activities (Exhibits 2F/323-325, 331-335, 5F/4-6, 12-18, 7F/5 and 10F/13). The residual functional capacity accounts for the claimant's migraines by finding she needs precautions of no climbing ladders, ropes, or scaffolds and she should avoid workplace hazards such as unprotected heights and moving mechanical parts. The claimant also testified the migraines were triggered by noise and the residual functional capacity finds the claimant should avoid more than occasional exposure to loud noise such as defined in the DOT as a result. The residual functional capacity considered the claimant's obesity as well despite the normal findings at family medicine and neurology appointments in finding the claimant would be limited to work at the light exertional level (Exhibits 2F/5-6, 11-12, 16, 21, 26-49, 68-69, 94-114, 120-169, 323-325, 331-335, 384-460, 5F/4-6, 12-18, 110, 126, 131-137, 7F/5 and 10F/13, 64-65).

(*Id.* at 33.)

Therefore, any error at Step Three was harmless.

In addition, substantial evidence supports the ALJ's determination that Ackerman did not equal Listing 11.02.  "As an initial matter, [Ackerman] has not directed us to a statement from an acceptable medical source that complies with SSR 19-4p, i.e., one that provides a detailed description of a typical migraine event, the side effects of her medications, and, most importantly, an opinion concerning the limitations in functioning associated with her migraines."  *Snyder v. Comm'r of Soc. Sec.*, Case No. 22-5948, 2023 WL 3673265, at *4 (6th Cir. May 26, 2023).  Other substantial evidence, including the records the ALJ cited and discussed in the opinion, support the finding that Ackerman did not equal Listing 11.02B.  (Tr. 29-33.)

Therefore, the undersigned recommends the Court affirm the ALJ's determination that Ackerman did not equal a listing.

**B.      Second Assignment of Error: Medical Opinion Evidence**

In her second assignment of error, Ackerman argues that the ALJ "unreasonably rejected the medical opinions of the record." (Doc. No. 7 at 13.)  Ackerman asserts that the opinions of nurse practitioner Thompson and state reviewing psychologists Dr. Matyi and Dr. Waggoner were consistent, and yet the ALJ determined that Thompson's opinion was not persuasive. (*Id.* at 14-15.)  Ackerman argues "[t]he ALJ failed to acknowledge that Ms. Thompson's opinion is supported by the treatment notes which consistently reveal anxiety, anger and irritability." (*Id.* at 15) (citations omitted).  Ackerman also asserts that the ALJ failed to "properly consider" the two most important factors under the revised regulations, supportability and consistency, in finding the opinions of Drs. Mayti and Waggoner only somewhat persuasive. (*Id.*)

The Commissioner argues Ackerman's "one-sentence argument" regarding the state agency reviewing psychologists' opinions is waived. (Doc. No. 10 at 10.)  In addition, the argument is meritless and should be rejected. (*Id.* at 9-10.)  The Commissioner further argues that substantial evidence supports the ALJ's determination of the social limitations contained in Thompson's opinions. (*Id.* at 10.)  The Commissioner asserts that "because the ALJ found the opinions of Ms. Thompson unpersuasive because they were unsupported by the record (as discussed more below) she was not required to compare the state agency psychologists' findings to Ms. Thompson's unsupported opinion." (*Id.* at 9) (citing *Ingram v. Comm'r of Soc. Sec.*, No. 1:20-CV-2692, 2022 WL 2237807, at *7 (N.D. Ohio June 22, 2022)).

Since Ackerman's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

### 1.     Thompson's Opinions

The ALJ analyzed and weighed Thompson's opinions as follows:

Therefore, based upon the foregoing, the undersigned considered the opinions of Erin Thompson, a mental health nurse practitioner at the claimant's mental

health provider, in October 2021 and January 2022 (Exhibits 6F/1-3 and 13F/1-3). Ms. Thompson stated the claimant's symptoms are severe enough to interfere with attention and concentration necessary to perform simple tasks greater than 25 percent of an eight-hour workday and she would be unable to perform job functions properly due to increased anxiety (Exhibits 6F/1 and 13F/1). Ms. Thompson also provided the claimant would be absent a minimum of four to five days per month (Exhibits 6F/2 and 13F/2). Ms. Thompson further stated the claimant would have moderate limitations in her ability to remember locations and work-like procedures, understand, remember and carry out very short, simple instructions, sustain an ordinary routine without special supervision and accept instructions and respond appropriately to criticism from supervisors with marked and extreme limitations in the other mental work-abilities (Exhibits 6F/2-3 and 13F/2-3).

The undersigned does not find Ms. Thompson's opinions persuasive. While the claimant's medication management records displayed the claimant experienced persistent depressive symptoms and anxiety even after beginning treatment with mental health specialists, the claimant was consistently cooperative, alert and oriented times three with her speech normal, her eye contact good, her attention good, her thought process organized and logical and her insight and judgment intact upon mental status examination at appointments (Exhibits 3F/43, 55-56, 65-67, 11F/12-56, 59-81 and 15F/61-78, 89-91, 93-95, 97-103). Medication management records also regularly showed the claimant's energy and motivation were stable, her concentration intact without distractibility, her behavior goal oriented and her meaningful relationships intact at appointments (Exhibits 11F/12-19, 24-49, 59, 74-79 and 15F/61-76, 89-101).

Likewise, family medicine records consistently exhibited the claimant was alert and oriented times three with a normal mood and affect upon examination before and after the claimant began treatment with a mental health specialist provider (Exhibits 2F/6, 12, 16, 21, 26, 34-49, 69, 95-106, 114-121, 126-131, 138-158, 384, 389-447, 5F/103-110, 126-131 and 10F/65-71). The record as well notes the claimant was able to engage in somewhat normal level of daily activities and interactions with the claimant caring for two young children, which can be quite demanding emotionally and physically in general, but the claimant's children have additional health issues that require additional care (Exhibit 12F/3). She was able to work part-time as well at various jobs along with maintain personal relationships with others with the claimant actively dating (Exhibit 3F/9, 52-53 and hearing testimony). Thus, the above objective evidence in combination with the claimant's activities of daily living do not support the severe limitations expressed in Ms. Thompson's opinions and the undersigned does not find the opinions persuasive.

(Tr. 27.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The ALJ considered the supportability and consistency of Thompson's opinions, discussing evidence that was unsupportive of disability in the process.  (Tr. 27.)  While Dr. Waggoner found Thompson's opinions "consistent and supportable" (*Id.* at 98), the ALJ disagreed with that assessment and explained her reasoning.  (*Id.* at 27.)  While the ALJ considered the lack of consistency of Thompson's opinion with other medical evidence in the record, it is true that the ALJ did not discuss the consistency of Thompson's opinions with those of the state agency reviewing psychologists.  (*Id.*)  However, to the extent that constituted error under the Revised Regulations, any such error is harmless.  "Once the ALJ determines that a medical source opinion is unpersuasive as unsupported by the source's own examination findings and provides a coherent explanation for why, any failure to also explain whether the source's opinion was consistent with other medical and nonmedical evidence is necessarily harmless."  *Ingram*, 2022 WL 2237807, at *7 (citing *Okonski v. Comm'r of Soc. Sec.*, No. 3:20-cv-1614, 2021 WL 4951763, at *——, 2021 U.S. Dist. LEXIS 204564, at *30 (N.D. Ohio Oct. 25, 2021); *DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 176 (9th Cir. 2009)).  "Thus, any shortcoming in the ALJ's compliance with 20 C.F.R. § 404.1520c in this case provides no basis for remand."  *Id.*

As this Court has previously stated, "Reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence.  *See Jones*, 336 F.3d at 477 (even if substantial evidence supports a claimant's position, a court can't overturn the Commissioner's decision if substantial evidence supports the ALJ's conclusion)."  *Garcia v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023), *report and recommendation adopted by* 2023 WL 2330893 (N.D. Ohio Mar. 2, 2023).  It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Ackerman would weigh the evidence differently, it is not for the Court to do so on appeal.

37

2.    **State agency reviewing psychologists' opinions**

The ALJ analyzed and weighed the state agency reviewing psychologists' opinions as follows:

> As for the State agency psychological consultants' mental assessments, they found the claimant able to comprehend and remember a variety of task instructions and capable of carrying out simple, one to two step and occasional complex and/or detailed, three to four step tasks, maintain attention, make simple decisions and adequately adhere to a schedule along with relate adequate on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers and no over-the-shoulder supervisor scrutiny in a setting where duties are routine and predictable with changes infrequent, explained in advance and introduced slowly (Exhibits 4A-6A, 9A-10A and 12A). The State agency psychological consultants also added the claimant would need a relatively isolated workstation and supervisory support when first learning job tasks (Exhibits 4A-6A, 9A-10A and 12A).

> The undersigned finds the State agency psychological consultants' opinions are somewhat persuasive. "Superficial interactions" is not adopted as it is not a defined vocation term and there is no other definition explaining the extent of that type of communication. While the claimant's mental health records also signaled the claimant experienced anxiety, particularly around unfamiliar others, the claimant was consistently cooperative and/or pleasant at appointments with her providers (Exhibits 2F/93-131, 138-161, 338, 435, 3F/16, 43-49, 62, 72-83, 11F/4-81 and 14F/14-54). Her medication management records as well revealed the claimant's meaningful relationships were intact at appointments (Exhibits 11F/12-19, 24-49, 59, 74-79 and 15F/61-76, 89-101). The claimant herself also related of being able to date and go out in the community to the grocery store with her medications assisting with her irritability and anger (Exhibits 6E/4, 3F/9, 52-53, 11F/49, 14F/50 and hearing testimony). As such, the above does not support the State agency psychological consultants' opinions that the claimant would require the severe social restrictions contemplated. Instead, the residual functional capacity finds the claimant is capable of occasional interaction with supervisors, coworkers, and the general public considering treatment records and activities of daily living.

> Similarly, therapy and medication management records demonstrated the claimant's memory was intact and/or her fund of knowledge adequate upon examination at appointments (Exhibits 3F/8-14, 24-56, 65-67, 11F/55-56 and 15F/41-42). Medication management records also regularly showed the claimant's concentration was intact without distractibility and her behavior goal oriented at appointments (Exhibits 11F/12-19, 24-49, 59, 74-79 and 15F/61-76, 89-101). The claimant herself as well reported she was able to prepare her own meals, clean, do laundry, wash dishes and pay her bills, activities that require multiple steps, in addition to caring for two children with medical issues, which is quite demanding emotionally (Exhibits 6E/3-4, 12F/3 and hearing testimony). Consequently, the above objective evidence does not support the State agency

consultants' opinions that the claimant would be limited to only one to four step tasks, making simple work-related decisions or she would need changes introduced slowly and the undersigned does not find that part of the State agency consultants' opinions persuasive either.

On the other hand, family medicine records provided the claimant related of exacerbations in her bipolar, anxiety and depressive symptoms when experiencing situational stressors such as when getting frustrated disciplining her son and caring for her grandmother (Exhibit 2F/3, 9, 401, 441, 5F/102). Therapy records also noted of the claimant feeling more anxious and/or down due to the stress regarding finding a babysitter for her children and losing her job (Exhibit 3F/27-39).

The claimant's reaction to such stressors above supports the State agency consultants' opinions that the claimant would require a setting where duties are routine and predictable with changes infrequent. The residual functional capacity accounts for such in finding the claimant is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work, and she is limited to occasional changes in the workplace that are well explained. The above also is appropriate given the claimant did testify she was not able to concentrate sometimes despite family medicine records consistently exhibiting she was alert and oriented times three and medication management records displaying her concentration intact without distractibility appointments (Exhibits 2F/6, 12, 16, 21, 26, 34 -49, 69, 95-106, 114-121, 126-131, 138-158, 384, 389-447, 5F/103-110, 126-131, 10F/65-71, 11F/12-19, 24-49, 59, 74-79 and 15F/61-76, 89-101).

(*Id.* at 28-29.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ considered the supportability and consistency of the state agency reviewing psychologists' opinions, discussing evidence that was unsupportive of disability in the process. (Tr. 28-29.) Again, it is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Ackerman would weigh the evidence differently, it is not for the Court to do so on appeal.

Therefore, the undersigned recommends the Court affirm the ALJ's findings regarding the opinions of Thompson, Dr. Matyi, and Dr. Waggoner.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: November 27, 2023                        *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge

## **<u>OBJECTIONS</u>**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**